**John ZACCARDI, Plaintiff–Appellant,**

v.

**ZALE CORPORATION, a Texas Corporation, Defendant–Appellee.**

No. 86–1748.

United States Court of Appeals,
Tenth Circuit.

Sept. 12, 1988.

Peter C. Collins of Winder & Haslam, Salt Lake City, Utah, for plaintiff-appellant.

Vincent C. Rampton (Robert S. Campbell, Jr., with him on the brief) of Watkiss & Campbell, Salt Lake City, Utah, for defendant-appellee.

Before MOORE and BALDOCK, Circuit Judges, and BOHANON, District Judge.[*]

JOHN P. MOORE, Circuit Judge.

Plaintiff John Zaccardi was discharged from his position with the defendant Zale Corporation for refusing to sign a form giving his consent to a polygraph examination. Mr. Zaccardi claims Zale violated New Mexico public policy by firing him for refusing to sign a form that contained false statements. He also claims Zale breached his employment contract by failing to have his discharge approved by "senior corporate management" as required by its 1982 personnel policy manual.

The district court granted Zale's motion for summary judgment on the wrongful discharge claim, denied Mr. Zaccardi's motion for partial summary judgment on this claim, and granted Zale's motion for summary judgment on the breach of contract claim. After reviewing the record, we have concluded there are genuine issues of material fact precluding summary judgment on Mr. Zaccardi's claim for breach of contract, but there are no such issues concerning his claim for wrongful discharge. We therefore affirm the district court's entry of summary judgment with respect to the wrongful discharge claim and reverse it with respect to the claim for breach of contract.

## I.

Zale is a Texas Corporation specializing in the retail sale of jewelry and related products. As part of its loss prevention program, Zale routinely administers polygraph examinations to all of its employees. In states where it is legal to do so, Zale adheres to a policy of terminating any of its employees who refuse to take a polygraph examination.

At the time of his discharge, Mr. Zaccardi was district manager for several of Zale's New Mexico stores. During his nearly twelve years of employment with Zale, he submitted to several polygraph examinations without any objection.

In early February 1983, a Zale polygrapher asked Mr. Zaccardi to take a polygraph test as part of a routine security survey he was conducting in several stores in Mr. Zaccardi's district. Mr. Zaccardi initially agreed. The polygrapher sat down with Mr. Zaccardi and went over the kinds of questions he would ask during the test. He then asked Mr. Zaccardi to sign a form stating:

> I, _____, do hereby voluntarily, without duress, coercion, promise of reward or immunity, request that I be examined on the polygraph in connection with _____. Having had same explained to me, and after reviewing all questions that I will be asked, I do hereby release, absolve, and forever hold harmless Zale Corporation, and its subsidiaries, together with all its agents and employees from any and all claims and demands whatsoever.[1]

Mr. Zaccardi read the form and told the polygrapher he wanted to strike the first sentence because he felt it was not true. He refused to sign the form unless it was changed. The polygrapher said he could not change the form, could not administer the test without the form, and would have to inform his superiors of Mr. Zaccardi's lack of cooperation. Mr. Zaccardi told the polygrapher to tell his superiors that he had "requested" a polygraph examination and that his objection related only to the language in the consent form.

The next day, Mr. Zaccardi received several telephone calls from his immediate supervisors, the regional vice-president and senior regional vice-president of the Zale Division of Zale Corporation. Both men urged him to sign the form. Mr. Zaccardi's supervisor suggested his conduct might af-

---

[*] Honorable Luther L. Bohanon, United States Senior District Judge, for the District of Oklahoma, sitting by designation.

1. This language is apparently intended to show compliance with section 2 of the New Mexico Polygraph Examiners' Creed of Conduct, which provides that "[n]o examinee will be compelled to take an examination" and that "no force, threats, duress, coercion or promises will be made in an effort to conduct an examination."

fect an upcoming bonus. However, these conversations served only to increase Mr. Zaccardi's determination not to sign the form unless it was changed.

Mr. Zaccardi later received another phone call from his senior regional vice-president, who advised him that the loss prevention manager for Zale Corporation and the executive vice-president of Zale Division were also on the line. At the end of this conversation, which may have included some discussion of the possibility of changing the word "request" to "consent" or "agree," Zale's senior regional vice-president told Mr. Zaccardi he would be fired if he did not sign the form and take the test. According to Mr. Zaccardi, this warning was delivered in a hostile manner and accompanied by obscene language.

Mr. Zaccardi continued to refuse to sign the form and was fired by his immediate supervisor on the next day. Mr. Zaccardi requested an "exit interview," prompting his supervisor to call the vice-president in charge of personnel for Zale Division. The vice-president in charge of personnel informed Mr. Zaccardi he was being terminated for violating company policy and for refusing to cooperate in a polygraph examination. He later called back to report he had confirmed this decision with the president and senior vice-president of Zale Division.

## II.

Mr. Zaccardi contends his discharge was unlawful because it resulted from his refusal "to do something required of him by his employer that public policy would condemn." *Vigil v. Arzola*, 102 N.M. 682, 699 P.2d 613, 620 (1983), *rev'd on other grounds*, 101 N.M. 687, 687 P.2d 1038 (1984). In granting Zale's motion for summary judgment on this claim, the district court apparently found there was no evi-

dence that Mr. Zaccardi's discharge resulted from violation of any "clear mandate" of New Mexico public policy.[2] *Vigil*, 699 P.2d at 619. Our review of the record confirms this conclusion.

We agree that New Mexico public policy "would condemn" a discharge based on an employee's refusal to sign a false statement. The important legal consequences of signed statements indicate a clear public policy against knowingly or recklessly requiring an employee to sign a false statement. *See, e.g., Magnan v. Anaconda Indus., Inc.*, 193 Conn. 558, 479 A.2d 781, 790 & n. 24 (1984). However, the record contains no evidence to support Mr. Zaccardi's contention that the language in Zale's consent form was false or misleading.

Although Mr. Zaccardi did not initially "request" a polygraph test, he admits that he later "requested" to be tested and was prevented from doing so only because of his refusal to sign the consent form. There is no evidence that this "request" was not made "voluntarily, without duress, coercion, promise of reward or immunity." Mr. Zaccardi argues that he only agreed to take the test because of Zale's implicit and explicit threats that it would discharge him if he did not do so. However, New Mexico law permits employers to terminate their employees for any bona fide reason that is not contractually prohibited or in violation of a "clear mandate" of public policy. *Vigil*, 699 P.2d at 618–19. Since mandatory polygraph examinations do not violate any contractual provision or any "clear mandate" of New Mexico public policy,[3] Zale's warnings that it would fire Mr. Zaccardi if he did not consent to the test do not constitute "duress, coercion, promise of reward or immunity" and do not render his willingness to be tested involuntary. *See, e.g., B & W Constr. Co. v. N.C. Ribble Co.*, 105

---

2. Since the parties have not included the court's oral statement of its reasons for granting summary judgment in the record on appeal, we have been forced to deduce this reasoning from the briefs.

3. Several states have enacted statutes prohibiting employers from requiring their employees to take polygraph tests. *See* Flanagan, *Employ-*

er–*Employee Relations—The Employee Polygraph Protection Act: Eliminating Polygraph Testing in Private Employment is not the Answer*, 11 S.Ill.U.L.J. 355, n. 2 (1987). However, New Mexico's laws regulating polygraphy contain no such prohibition. *See* N.M.Stat.Ann. §§ 61–26–1 to 61–26–13.

N.M. 448, 734 P.2d 226, 228, 230 (1987) (duress cannot result from the exercise of a legal right).

Mr. Zaccardi also claims his discharge violated public policies expressed in: the New Mexico Polygraph Examiners' Code of Ethics § 4 (requiring polygraphers to inform examinees of "infeasibility" of conducting polygraph examinations in unsuitable areas); N.M.Stat.Ann. § 30–16–9 (prohibiting extortion); N.M.Stat.Ann. § 30–20–12 (prohibiting use of obscene language over telephone with intent to terrify, intimidate, threaten, harass, annoy or offend); and *Apodaca v. Miller*, 79 N.M. 160, 441 P.2d 200, 204 (1968) (recognizing right of action for invasion of privacy). However, he cites no legal authority for his contentions that routine security investigations are considered unsuitable for polygraph testing under New Mexico law; that any "threats" directed against him were extortionate in nature; that any obscene statements over the telephone were made with unlawful intent; or that the use of polygraph examinations constitutes an invasion of privacy under New Mexico law.[4] Moreover, none of these alleged violations of public policy have a "sufficient nexus" with Mr. Zaccardi's refusal to sign the consent form, which is the undisputed reason for Mr. Zaccardi's discharge. *See Vigil*, 699 P.2d at 620.

Consequently, we affirm the district court's entry of summary judgment on Mr. Zaccardi's claim for wrongful discharge.

### III.

Mr. Zaccardi also contends Zale breached his employment contract by failing to have his discharge approved by "senior corporate management" as required by its 1982 personnel policy manual. The district court found the personnel manual did not give rise to any contractual rights because its foreword explicitly disclaimed any contractual intent[5] and because it did not exist when Mr. Zaccardi became a Zale employee. The court also found that Zale had substantially complied with the manual's procedural requirements by obtaining the approval of "responsible superiors." We disagree with both conclusions.

Under New Mexico law, a personnel manual gives rise to an implied contract if it "controlled the employer-employee relationship" and an employee could reasonably "expect [her employer] to conform" to the procedures it outlined. *Forrester v. Parker*, 93 N.M. 781, 606 P.2d 191, 192 (1980); *Hernandez v. Home Educ. Livelihood Program*, 98 N.M. 125, 645 P.2d 1381, 1384 (App.1982), *cert. denied*, 98 N.M. 336, 648 P.2d 794 (1982). Whether a personnel manual gives rise to implied contractual obligations "is a question of fact ... 'to be discerned from the totality of the parties' statements and actions regarding the employment relationship.'" *Lukoski v. Sandia Indian Mgmt. Co.*, 106 N.M. 664, 748 P.2d 507, 509 (1988) (quoting *Wagenseller v. Scottsdale Mem. Hosp.*, 147 Ariz. 370, 710 P.2d 1025, 1038 (1985) (en banc)).

Neither a contractual disclaimer nor the fact that a manual is promulgated after an employee begins work is sufficient to justify summary judgment on a claim for breach of contract. A contractual disclaimer does not automatically negate a document's contractual status and must be read by reference to the parties' "norms of

---

**4.** *Compare Cordle v. General Hugh Mercer Corp.*, 325 S.E.2d 111, 116–17 (W.Va.1984) (holding mandatory polygraph testing violated state public policy against invasion of privacy even before it was statutorily prohibited).

**5.** The foreword stated:

This Personnel Policy Manual is made available to all Zale Corporation management personnel as a guide to be used in making decisions or communicating information on personnel matters. The text is a compilation of past policies and procedures, previously unwritten customs, and recent developments.

Collectively, it contains the current personnel policies, practices, and procedures of the company.

While every effort has been made to create a manual which is specific as possible the policies and procedures set forth are a guideline and are not intended to cover and cannot cover every contingency, circumstance or situation. *This manual is not intended and shall not be interpreted to be a formal legal contract, binding on the company.*

(Emphasis added.)

conduct and expectations founded upon them." *Hillis v. Meister*, 82 N.M. 474, 483 P.2d 1314, 1317 (1971) (citing *Greene v. Howard Univ.*, 412 F.2d 1128, 1134–35 (D.C.Cir.1969)).[6] A personnel manual issued after the initial date of employment can give rise to contractual obligations so long as there is evidence that the manual "modified" the employment relationship. *Lukoski*, 748 P.2d at 509.

Our review of the record persuades us there is a genuine issue of fact concerning whether the parties' "statements and actions" gave rise to an implied contract. Several of Zale's executives stated in their depositions that they considered the manual to be a "guide" for employer-employee relations. *See Forrester*, 606 P.2d at 192 (finding implied contract in manual intended as "guide in giving directions to the staff"). In addition, the manual states that *"[n]o employee* who has been employed for ten (10) years or longer *is to be terminated* from the company without the approval of senior corporate management" and that supervisors *"must"* provide "senior corporate management" with certain specified information before firing such employees.[7] (Emphases added.) Thus, unlike the manual at issue in *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 886 (10th Cir.1985), Zale's manual contains "specific contractual terms" that might evince contractual intent.

We are also convinced there are genuine issues of fact relating to whether Zale substantially complied with the manual's procedural requirements. A party has substantially complied with a contract's procedural requirements if it has fulfilled the purpose of the requirements and satisfied the "substantial interests" of the parties. *Piacitelli v. Southern Utah State College*, 636 P.2d 1063, 1066 (Utah 1981) (employer satisfied four-step "progressive discipline" procedure with actions that fulfilled underlying purpose of giving "early warning of possible consequences"). The district court found that Zale had fulfilled the purpose of the manual's requirements by having "responsible superiors" review Mr. Zaccardi's discharge. However, statements in several depositions indicate that the term "senior corporate management" refers to a specific group of executives in Zale's Corporate Division and that none of the individuals who participated in Mr. Zaccardi's dismissal are members of this group.[8] This evidence is sufficient to raise a genuine issue of fact regarding the provision's underlying purpose and the "substantial interests" it was intended to protect.

Accordingly, we reverse the district court's summary dismissal of plaintiff's claim for breach of contract.

**AFFIRMED IN PART AND REVERSED IN PART.**

BOHANON, District Judge, dissenting.

I agree with Part II of the majority's opinion which affirms the district court's entry of summary judgment on Mr. Zaccardi's claim for wrongful discharge. However, I cannot concur in the majority's opinion reversing the district court's summary dismissal of plaintiff's claim for breach of contract.

There are times when a personnel manual can be the basis of an implied contract. However, under general contract theory, Zale's personnel manual fails to rise to that level.

**6.** In *Greene,* for example, the D.C.Circuit suggested that a contractual disclaimer in one section of a manual might have been intended only to preserve rights specified in other sections of the manual. *See id.,* 412 F.2d at 1135 n. 10; *see also Brookshaw v. South St. Paul Feed, Inc.,* 381 N.W.2d 33, 36 (Minn.Ct.App.1986) (disclaimer read as merely reserving right to revise manual's policies at any time); *Morriss v. Coleman Co.,* 241 Kan. 501, 738 P.2d 841, 849 (1987) (disclaimer does not negate contractual obligations if there is other evidence of contractual intent and disclaimer was not brought to employees' personal attention).

**7.** The manual requires supervisors to provide the employee's date of employment, position, salary, reason for proposed termination, and "any other pertinent data."

**8.** There is conflicting evidence concerning whether the president of Zale Division is a member of "senior corporate management."

An implied contract is inferred from "the circumstances surrounding the transaction making it reasonable ... [to assume] that a contract existed between [the parties] by tacit understanding." Black's Law Dictionary 292 (5th ed. 1979). Thus, the mere definition of an implied contract supports the conclusion that a contract or a modification of an earlier contract could not be implied from Zale's personnel guide. In other words, from the circumstances it cannot be inferred that both parties intended to contract.

This requisite intent to form a contract is also termed "meeting of the minds." A meeting of the minds is no less a requirement in implied contracts than in express contracts. *See Altman v. Alaska Truss Mfg. Co., Inc.*, 677 P.2d 1215 (Alaska 1983); *Pyeatte v. Pyeatte*, 135 Ariz. 346, 661 P.2d 196 (Ct.App.Ariz.1982); *ARA Manufacturing v. Cohen*, 654 P.2d 857, 859 (Ct.App. Colo.1982); *Bell v. Hegewald*, 95 Wash.2d 686, 628 P.2d 1305 (1981). This requisite intent, or meeting of the minds is first to be determined by the objective manifestation of the parties. *Trujillo v. Glen Falls Ins. Co.*, 88 N.M. 279, 540 P.2d 209 (1975). Zale's objective intent was expressed in the manual in the statement, "This manual is not intended and shall not be interpreted to be a formal legal contract, binding on the company." A more definite statement of the intent not to be bound is difficult to imagine. The manual could not have been the basis of a contract, either express or implied, since this statement precludes a "meeting of the minds." The elements of a contract, either express or implied, have not been met.

Likewise, the manual cannot constitute a modification of a contract. Modification, like an original contract, requires the intent to be bound, or a meeting of the minds. The preceding argument equally applies to a modification.

Both the majority and the appellant primarily rely on *Forrester v. Parker*, 93 N.M. 781, 606 P.2d 191 (1980) and *Lukoski v. Sandia Indian Mgmt. Co.*, 106 N.M. 664, 748 P.2d 507 (1988). In *Forrester*, the New Mexico Supreme Court ruled that an implied contract had been formed based on a personnel policy guide. *Forrester*, 606 P.2d at 192. The court cited several factors for the basis of its decision: (1) The guide was in effect when the plaintiff started employment; (2) The guide was followed regarding other aspects of the plaintiff's employment; (3) The letter terminating the plaintiff's employment recited that termination was pursuant to the guide; (4) The defendant stated that the guide was "standard operating procedure." There is no indication that the guide in *Forrester* contained a statement of the defendant's intent not to be bound. The court found the plaintiff reasonably relied on the guide. From these factors, the court found an implied contract. Likewise, in *Lukoski* the New Mexico Supreme Court found a modification of the employment relationship based on a personnel guide. The factors on which the court based its decision are: (1) The plaintiff was required to sign an agreement that he would conform to the stated policies and procedures contained in the manual; (2) "[T]he language of the handbook [did] nothing to alert an employee against placing reliance on any statement [in the handbook] as a unilateral expression of the [defendant's] intention." *Lukoski*, 748 P.2d at 509. Since the factors in *Forrester* and in *Lukoski* are not present in the case at bar, reliance on these cases by the majority to support its opinion is misplaced.

This misplaced reliance is emphasized by the court in *Lukoski*, 748 P.2d at 509–10, quoting *Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (1985) (en banc):

We do not mean to imply that all personal manual [sic] will become part of employment contracts. Employers are certainly free to issue no personnel manuals at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason. Such actions ... instill no reasonable expectations of job security and do not give employees

any reason to rely on representations in the manual....

*Lukoski*, 478 P.2d at 509–10.

In the case at bar the personnel manual clearly tells the plaintiff and other employees that the manual is not part of the employment contract. Thus, a reliance on statements in the manual are unreasonable and unjustified. *See Lukoski*, 748 P.2d at 510. Under the rule stated in *Lukoski*, there is no implied contract in this case. To hold otherwise would prevent an employer from issuing any employee guidelines without potentially creating an implied contract.

For the reasons stated, I can find no basis for implying a contract based on Zale's personnel manual. Therefore, I respectfully dissent.

Concurring in part, dissenting in part.